UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA A. BEACH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-cv-02897 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Arlander Keys |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Barbara A. Beach, moves this Court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner"), who denied her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). 42 U.S.C. § 401 *et seq.* (West 2007). Defendant Commissioner has filed a cross-motion for summary judgment. For the reasons set forth below, Plaintiff's motion is granted and Defendant's motion is denied; the Court remands this case to the Commissioner for further proceedings.

## PROCEDURAL HISTORY

On April 25, 2006, Plaintiff Barbara A. Beach applied for SSI and DIB, claiming that she became disabled on March 22, 2006, due to attention deficit disorder ("ADD"), depression, vision problems, and a learning disability. (R. at 9, 64.) Ms. Beach

stated in a Disability Report (Form SSA-3368) that these impairments cause her to be "slow at learning" and to "have a hard time concentrating and remembering instructions." (R. at 132.) Her request for benefits was denied on July 26, 2006. (R. at 9.) She then filed a Request for Reconsideration on September 22, 2006, stating that her impairments were so severe that she could not "perform [her] past relevant job or any other job that exists in the national economy." (R. at 71.) After review, the Social Security Administration (SSA), based on reports submitted by a state agency physician and disability examiner, determined that the original denial of benefits was proper. (R. at 72-77.) The SSA found that she could still perform the functions and duties of her past job as a customer service representative. (R. at 80-81.)

Ms. Beach subsequently requested a hearing before an Administrative Law Judge ("ALJ") which was held on December 2, 2008. (R. at 16, 82.) On December 16, 2008, after hearing the testimony of Ms. Beach and a vocational expert, the ALJ found Ms. Beach not to be disabled. (R. at 9-15.) Ms. Beach then submitted a Request for Review of the ALJ's decision. (R. at 5.) This request was denied on March 17, 2009, making the ALJ's decision the final agency determination. (R. at 1-4.)

Ms. Beach filed a Complaint for Judicial Review. This case was originally assigned to Judge John W. Darrah, but upon consent

of both parties, the case was re-assigned to this Court. Thereafter, Ms. Beach moved to reverse or remand the final decision of the Commissioner and Defendant Commissioner moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## FACTS

### I.   Hearing Before the ALJ

Ms. Beach and her attorney appeared before the ALJ on December 2, 2008. (R. at 18.) Testimony was taken from Ms. Beach; Ms. Bonnie McAfee, Ms. Beach's sister; and Dr. Chris Ann Cheryl-Gist, a vocational expert. (R. at 17.)

#### A.   Testimony of Plaintiff

Ms. Beach testified that she is a single, fifty-five year old woman, living alone in Elmhurst, Illinois. (R. at 20.) She earned an Associate's degree in office careers from the College of DuPage. (R. at 20-21.) She has had several jobs over the past eighteen years. Most recently, and after the onset of her disability on March 22, 2006, she has been working part-time as a grocery bagger at Jewel Food Stores. (R. at 21.) She works approximately sixteen to eighteen hours per week and experiences no difficulty performing this job. (*Id.*) Shortly before she began her current position at Jewel, Ms. Beach attempted to work as a cashier at Walgreens; this job only lasted three months, as she testified that she could not "keep[] up with what [she] needed to

learn for that job." (R. at 23.) Ms. Beach also worked as a
bagger from 2002 to 2005. (R. at 22.) From 1999 to 2002, she was
employed as a full-time general office clerk, where her duties
were to file and answer the telephone. (R. at 22-23.) During an
unspecified two-month period, Ms. Beach was hired to dress in a
costume and wave to people driving by a storefront. (R. at 24.)
And from 1992 to 1999, she worked at a small office where her
duties were similar to the clerk position described above, only
here the phone seldom rang. (R. at 35.)

Ms. Beach further testified that she only works part-time
because she fatigues easily. (R. at 24.) For example, she takes a
one to two hour nap every working day. (R. at 42.) Additionally,
she can only walk a few blocks and lift approximately five pounds
before she becomes fatigued. (R. at 26.) Her ailments also
prevent her from working full-time. Specifically, she suffers
from asthma, diabetes, vision problems, and ADD, which causes her
to have difficulty learning new tasks and remembering information
that she learned a short time earlier. (R. at 25, 31-32.) She can
concentrate for approximately one-half hour. (R. at 37.)

When questioned about her ability to take care of herself,
Ms. Beach explained that she does not have any problems doing her
laundry, cleaning her apartment, or maintaining her checking
account. (R. at 28-29.) She does not drive, as her car stopped
working. (R. at 28.) She walks to her current job. (*Id.*) Ms.

4

Beach stated that her disabling conditions are stable -- not getting worse and not getting better. (R. at 29.) From a social perspective, she is uncomfortable around too much noise and too many people, so she prefers to stay in her quiet home, rather than attempt to socialize. (R. at 38.)

**B.    Testimony of Bonnie McAfee, Plaintiff's Sister**

Ms. McAfee, Plaintiff's sister, testified that Ms. Beach does not realize that she has problems with many of the daily activities that Ms. Beach previously indicated she experiences no difficulty completing. (R. at 29.) Ms. McAfee further explained that Ms. Beach struggles to maintain the pace of an average person. (*Id.*) For example, Ms. McAfee indicated that Ms. Beach had to file for bankruptcy because she did not know how to properly use her credit card. (R. at 29-30.)

Ms. McAfee testified that Ms. Beach's customer service job was an accommodation to Ms. McAfee by a friend. (R. at 47.) A few months into the job, the employer realized that Ms. Beach could not "keep[] up" and thus wanted to terminate her employment. (*Id.*) However, Ms. McAfee "talked them into keeping her." (*Id.*) Ms. McAfee also testified that Ms. Beach received special accommodations while obtaining her degree at the College of DuPage; she took one class at a time with close guidance by a university employee. (R. at 45-46.)

Ms. McAfee indicated that she helps Ms. Beach with a task or activity every day, whether it is driving her somewhere, helping her understand and complete paperwork and bills, or helping her purchase a cell phone. (R. at 30.) Ms. McAfee concluded her testimony by stating that "[Ms. Beach] cannot live on her own without assistance . . . . Never has. Never will . . . ." (*Id.*)

### C. Testimony of Dr. Chris Ann Cheryl-Gist, Vocational Expert

Dr. Gist first assessed and characterized Ms. Beach's jobs within the fifteen years prior to the claim at hand. (R. at 51.) Dr. Gist indicated that most of the exertional levels were "light" with the exception of one that was "sedentary." (*Id.*) She classified Ms. Beach's job where her primary duty was to answer the phone as "unskilled." Therefore, her final job characterization is "unskilled and sedentary to light." (*Id.*)

The ALJ asked Dr. Gist a hypothetical question involving an individual that is the same age, that has had the same full-time work experience, and has the same amount of education as Ms. Beach (even though Ms. Beach may have been subject to accommodations by the College of DuPage). (*Id.*) The ALJ asked whether the hypothetical individual could return to any past work with Ms. Beach's residual functional capacity ("RFC") (ability to only conduct light and sedentary work, vision limitations, and environmental limitations to avoid concentrated exposure to hazards in the air), a marked limitation in the ability to carry

out detailed instructions, and moderate limitations in the ability to maintain attention and concentration for extended periods of time. (R. at 52-53.) The individual is also moderately limited in her ability to: understand and remember detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary work tolerances. (R. at 52.) Dr. Gist concluded that the hypothetical individual could perform the reception and filing work that Ms. Beach performed for many years. (R. at 53.) The second hypothetical question posed by the ALJ was directed at Dr. Gist's opinion of the same hypothetical individual's vocational outlook. (*Id.*) Dr. Gist concluded that the individual was not capable of competitive employment. (*Id.*)

## II. Medical History

Ms. Beach has had several primary ailments, both physical and mental, over the course of her life. Of these primary ailments, her physical ailments include diabetic retinopathy (R. at 226), type II diabetes (R. at 225), and cataracts in both eyes (R. at 246). Her mental ailments include depression (R. at 227) and ADD (R. at 214-17).

### A. Physical Ailments

Dr. Mary Ann Malloy has served as Ms. Beach's primary care physician dating back to 2002. (R. at 241-42.) Most of Dr. Malloy's notes indicate that Ms. Beach is a "pleasant lady." (R.

7

at 223.) Over the course of the years, Dr. Malloy's primary service to Ms. Beach has been to provide treatment for diabetes and a short bout of asthma. Dr. Malloy has also referred her to several other doctors, including an eye specialist to handle her cataracts, a psychologist, and a diabetes counselor.

### 1. Diabetes

Ms. Beach was diagnosed with diabetes mellitus in 2002. (R. at 385.) Throughout Dr. Malloy's chart notes she indicates that Ms. Beach's diabetes is "uncontrolled," (R. at 311), or "poorly controlled," (R. at 305). On April 13, 2004, Dr. Malloy expressed extreme concern for Ms. Beach's lack of control and stressed the need for some oversight; she suggested that Ms. Beach see a diabetic educator. (R. at 311.) In July 2005, Dr. Malloy noted that Ms. Beach has "understanding disabilities" as she was noncompliant with the diet and exercise regimen that she was told to follow to help combat her diabetes. (R. at 304.) Around the same time, Dr. Zain Sayed conducted a consultative examination, where he confirmed that Ms. Beach had reduced vision and a history of learning disability, diabetes, and asthma. (R. at 385-86.)

### 2. Asthma

On June 4, 2003, after a physical examination uncovered "diffuse wheezes" in Ms. Beach's lungs, later described as bronchial asthma, Dr. Malloy prescribed to her a nebulizer

treatment and an inhaler. (R. at 238.) By July 14, 2003, Dr. Malloy noted that Ms. Beach's bronchial asthma had completely cleared. (R. at 236.)

### 3. Cataracts

On May 23, 2005, Dr. Robert J. Marselle performed cataract surgery on Ms. Beach's left eye. (R. at 284-85.) Prior to the surgery, Dr. Marselle noted that Ms. Beach's visual acuity with correction was 20/50 in her right eye and 20/400 in her left eye. (R. at 326.) The surgery appeared to be successful, as Ms. Beach went from wearing "very thick glasses," (R. at 226), to not needing to wear glasses at all. (R. at 225.)

### B. Mental Ailments

#### 1. ADD

Dr. William A. Hovsepian diagnosed Ms. Beach with ADD with hyperactive-like features on February 20, 1998. (R. at 214-17.) Dr. Hovsepian noted that it is possible she also has underlying learning disabilities and that further testing should be conducted. (*Id.*) The suggested additional tests do not appear to have been performed. When Ms. Beach saw Dr. Malloy on November 12, 2002, she had stopped taking the medication prescribed to her for ADD. (R. at 242.) However, Dr. Malloy requested that she resume taking the medication Paxil daily. (R. at 241.)

## 2. Depression

As early as June 3, 2003, Dr. Malloy noted that Ms. Beach suffers from depression. (R. at 244.) Dr. Malloy indicated on August 26, 2003, that Ms. Beach has many "significant psychiatric problems" and, as a result, she referred her to two psychiatric consultants for help. (R. at 235.) Ms. Beach told Dr. Malloy that the two medications she was taking, Ritalin and Paxil, were helping to control her depression. (*Id.*)

In 2004, the Illinois Department of Human Services, Office of Rehabilitation Services referred Ms. Beach to Dr. John Tirado for a psychological evaluation. (R. at 447.) During this evaluation, Dr. Tirado conducted several tests and a diagnostic interview. (*Id.*) Aside from being forty-five minutes late for the meeting, Ms. Beach was found to be "alert and oriented for person, place, and time." (R. at 448.) Dr. Tirado stated that Ms. Beach's "memory for recent and remote events was grossly intact." (*Id.*) The tests revealed that Ms. Beach's overall cognitive ability was low. Her full scale IQ was determined to be 88, placing Ms. Beach in the twenty-first percentile. (R. at 451.) The tests also revealed Ms. Beach's "working memory" to be low, making it hard for her to retain and process information (*Id.*) In fact, Ms. Beach's processing speed was only faster than eighteen percent of other adults. (*Id.*) Ms. Beach's reading and spelling skills were found to be consistent with her level of formal

education. (*Id.*) Dr. Tirado was surprised, however, to learn that Ms. Beach's arithmetic skill level was low. (*Id.*) Dr. Tirado noted that this low arithmetic skill level should not impede Ms. Beach from performing simple calculations like balancing her check book or calculating grocery costs. (*Id.*) Finally, Dr. Tirado indicated that Ms. Beach did show signs of depression, although he found her to be in stable condition. (R. at 452.) Overall, Dr. Tirado concluded his report by stating that Ms. Beach should be able to work in jobs that are more demanding than her current job as a grocery bagger, especially with the help of "compensatory strategies that would aid her work performance." (*Id.*) These compensatory strategies could include an electronic organizer or mere paper and pencil to help keep track of tasks. (*Id.*)

In June 2006, the Bureau of Disability Determination Services, Illinois Department of Rehabilitation Services referred Ms. Beach to Dr. Syed I. Ali for a psychiatric evaluation. (R. at 370.) In reviewing her past job history, Ms. Beach indicated that she was laid off from several jobs because of her poor eyesight. (R. at 371.) In addition, she stated that she is "depressed and worried because [she] ha[s]n't had a job and [she is] worried about being homeless." (*Id.*) Dr. Ali noted that Ms. Beach performs the usual domestic chores, including laundry, cooking, and shopping. (R. at 372.) In his diagnosis, Dr. Ali concluded

11

that Ms. Beach has an Axis I Major Depressive Disorder, no diagnosis for Axis II, and an Axis III diagnosis of Diabetes Mellitus, per her history. (*Id.*)

In July 2006, a psychiatric review of Ms. Beach was conducted by Dr. Donald Cochran. (R. at 388-401.) The review revealed that an RFC assessment was necessary. (R. at 388.) Dr. Cochran concluded that Ms. Beach suffers from ADD and depression, noting that her depression is due to "job loss [and] fear of being homeless." (R. at 400.) However, Dr. Cochran also concluded that Ms. Beach "retains the capacity to do simple work related tasks in the context of SGA." (*Id.*) Furthermore, Ms. Beach was found to have a "moderate" degree of limitation with respect to restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. (R. at 398.) Dr. Cochran also conducted a Mental Residual Functional Capacity Assessment, which had similar findings to the psychiatric review. (R. at 404.) Ms. Beach's only functional capacity not found to be "not significantly limited" or "moderately limited" was her "ability to carry out detailed instructions." (R. at 402-03.) In this functional capacity, Ms. Beach was found to be "markedly limited." (R. at 402.)

In July 2007, Ms. Beach received another psychological evaluation, conducted by psychological intern Sarah Sarhaddi and

supervised by Dr. Carolyn Bailey. (R. at 454.) In the clinical interview, it was discovered that it took Ms. Beach ten years to complete her degree at College of Dupage. (R. at 455.) The tests conducted in this examination resulted in many of the same scores and determinations from previous examinations. (R. at 456-57.) However, Ms. Sarhaddi and Dr. Bailey diagnosed Ms. Beach with an Axis I Dysthymic Disorder, Axis II Schizoid Personality Disorder, Axis III Type II diabetes and cataracts, Axis IV problems related to social environment and occupational problems, and Axis V GAF score of 53. (R. at 459.)

### III. The ALJ's Decision

The ALJ found that Ms. Beach has not been under a disability, as defined by the Social Security Act, at any time from March 22, 2006, through December 16, 2008, the date his opinion was written. (R. at 14.) The ALJ found that Ms. Beach met Step One and Step Two of the five-step sequential evaluation process used to determine whether a person is disabled for purposes of social security disability benefits. (R. at 12.) The ALJ noted in his Step Two analysis that Ms. Beach's severe impairments include diabetes mellitus, status post cataract surgery, asthma, ADD, and depression. (*Id.*)

Steps three through five, however, were not found in Ms. Beach's favor. (R. at 12-14.) At Step Three, the ALJ found that Ms. Beach's impairments did not meet or medically equal any

13

listed impairment found in 20 C.F.R. Part 404, Subpart P,
Appendix 1. (R. at 12.) At Step Four, the ALJ found that Ms.
Beach has the residual functional capacity to perform light work
subject to limitations.  (R. at 13.)  In assessing Ms. Beach's
testimony of symptoms and functional limitations, the ALJ
determined that the objective evidence provided by an internal
consultative examination and a consultative psychological
examination demonstrated that her symptoms did not preclude her
ability to perform light unskilled work. (R. at 13-14.) Finally,
at Step Five, the ALJ found that Ms. Beach was capable of
performing past work, including her roles as a receptionist and
clerk. (R. at 14.)

## STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court may not decide
the facts, reweigh the evidence, or substitute its own judgment
for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th
Cir. 1994). Where conflicting evidence allows reasonable minds to
differ, the responsibility for determining whether the plaintiff
is disabled falls upon the Commissioner, not the courts. *Herr v.
Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Rather, the Court
must accept findings of fact that are supported by "substantial
evidence," 42 U.S.C. § 405(g), where substantial evidence is
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Herron*, 19 F.3d at 333

(quoting *Dray v. R.R. Ret. Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993)).

This does not mean that the ALJ is entitled to unlimited judicial deference, however. He must consider all evidence, good and bad. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). When the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). While the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski*, 732 F.2d at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477-78, 71 S. Ct. 456, 95 L. Ed. 456 (1951)) (finding that substantial evidence in favor of the

15

agency's decision cannot be determined in isolation from the aggregate record).

## SOCIAL SECURITY REGULATIONS

For a person to be entitled to disability benefits under the Social Security Act, the person must be disabled. 20 C.F.R. § 404.1501. A disability is the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505. To aid in determining whether a person has a disability, social security regulations mandate a five-step sequential evaluation process. 20 C.F.R. § 404.1520. An ALJ must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's medical impairments are severe; (3) whether the medical impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether, after considering the claimant's RFC, the claimant could still engage in past relevant work; and (5) whether the claimant can perform any other work, after assessing RFC, age, education, and past

work experience.[1] 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).

Throughout the five-step sequential evaluation process, an additional evaluation technique is used to evaluate the severity of mental impairments. 20 C.F.R. § 404.1520a. Step One of the special technique requires an ALJ to evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If it is determined that a claimant has a medically determinable mental impairment, any symptoms, signs, and laboratory findings that substantiate the presence of the impairment must be documented in accordance with paragraph (e) of the statute.[2] *Id.* Step Two of the special technique is to rate the degree of functional limitation resulting from the impairment in four categories: (1) activities

---

[1] "A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two, or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Young v. Sec'y of Health & Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

[2] Paragraph (e) provides,

At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), and at the Federal reviewing official, administrative law judge, and the Decision Review Board levels in claims adjudicated under the procedures in part 405 of this chapter, we will document application of the technique in the decision.

of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(1)-(3). Categories (1) through (3) are rated "none," "mild," "moderate," "marked," or "extreme." 20 C.F.R. § 404.1520a(c)(4). Category (4) is rated "none," "one or two," "three," or "four or more." *Id.* Finally, using the ratings applied above, the severity of the mental impairment must be determined. 20 C.F.R. § 404.1520a(d)(1)-(2).

## DISCUSSION

Ms. Beach makes three principal arguments. First, she argues that the ALJ's Step Two determination was erroneous. Second, she argues that the ALJ's Step Three determination was erroneous for two reasons: (i) the ALJ did not cite the specific listings he considered to determine that her impairments fail to meet or medically equal a listed impairment and did not complete an "equivalence analysis" and (ii) the ALJ failed to completely evaluate her mental illness. Third, Ms. Beach argues that the ALJ's Step Four determination was erroneous because: (i) the ALJ did not consider evidence in the record subsequent to the state agency determination that he adopted; (ii) the ALJ did not conduct a function-by-function analysis of her impairments to determine their effects; (iii) the ALJ failed to consider an entire line of evidence in support of her mental impairments; and (iv) the ALJ misinterpreted a consultative examination.

18

## I. The ALJ's Step Two Determination

At Step Two of the sequential process, the ALJ found that Ms. Beach "has severe impairments: diabetes mellitus, status post cataract surgery, asthma, an attention deficit disorder and history of depression." (R. at 12.) Even though the ALJ found in her favor, Ms. Beach argues that the ALJ's Step Two determination was erroneous. She argues that the ALJ's lack of discussion with regard to his Step Two finding and his failure to comply with Social Security Ruling ("SSR") 96-3p by not "establish[ing] the relationship between the medically determinable impairments and the alleged symptoms, and then . . . assess[ing] the intensity, persistence, and limiting effects of the symptoms" skewed the remainder of his decision. (Brief for Plaintiff at 7.)

After reviewing the ALJ's Step Two determination, it is clear that he made no additional comments beyond his conclusion that Ms. Beach suffers from severe impairments. (R. at 12.) It is true that SSR 96-3p requires an evaluation of the "functionally limiting effects of an [individual's] impairment(s)," SSR 96-3p, 1996 SSR LEXIS 10 at *2, however, an ALJ need not evaluate every piece of evidence in writing. *Herron*, 19 F.3d at 333; *see also Morgan v. Astrue*, No. 07 C 1741, 2009 WL 650364, at *8 (N.D. Ill. Mar. 9, 2009). This is especially true at Step Two of the sequential process. *See id.* (finding no case has been remanded "solely on the basis of a Step Two determination that was

favorable to a claimant, but cursory"). The court in *Morgan v. Astrue* held that if the ALJ finds in plaintiff's favor at Step Two and proceeds to the next step, lack of discussion by the ALJ provided at Step Two is not reversible error. *See id.*

There does, however, need to be careful evaluation of the evidence at this step. *See* SSR 96-3p. Here, the ALJ found that Ms. Beach's impairments were severe, so one can assume that he carefully analyzed the evidence at this step. Only when an ALJ finds that a plaintiff's impairments are not severe is he required to provide explanatory documentation at this step. Therefore, this is not an error that is cause for remand, as the ALJ found in Ms. Beach's favor. Furthermore, the ALJ did consider the "intensity, persistence, and limiting effects of the symptoms" later in his decision at Step Four, which makes it a harmless error to have omitted it at this step. (*See* R. at 13.)

## II. The ALJ's Step Three Determination

At Step Three, the ALJ found that Ms. Beach's "impairments do not meet or medically equal any listed impairment. . . ." (R. at 12.) In Step Three, an ALJ must determine whether the impairments meet or equal one of the listed impairments in Appendix 1 of Subpart P. 20 C.F.R. § 404.1520(a)(4)(iii).[3] If a claimant's impairments meet the criteria of a listed impairment,

---

[3] Appendix 1 lists the impairments that have been pre-determined to be severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525(a).

the claimant is presumptively disabled. 20 C.F.R. § 404.1520(d).
Even if a claimant's impairments do not meet the criteria of a
listed impairment, the claimant can still be found to be disabled
if her impairments medically equal the criteria of a listing. 20
C.F.R. § 404.1525(c)(5).

Here, Ms. Beach contends that the ALJ's determination was
erroneous. She makes two arguments, each of which will be
assessed individually.

A. Specific Listings

First, Ms. Beach argues that the ALJ failed to refer to
evidence that supports his Step Three determination that her
"impairments do not meet or medically equal any listed
impairment . . . ." (R. at 12.) Defendant argues that the ALJ
explained how he reached his conclusion by stating that he
considered "the claimant's clinical signs and findings [and] .
. . the opinions of the State Agency Medical consultants."
(*Id.*)

When determining whether the impairments meet or equal a
listed impairment, "an ALJ must discuss the listing by name
and offer more than a perfunctory analysis of the listing."
*See e.g. Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.
2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783,
786 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589, 595-96
(7th Cir. 2002). The court in *Barnett v. Barnhart* found that

21

the ALJ's two-sentence discussion of his determination in Step Two was "inadequate and warrant[ed] a remand" even though it could be inferred which Appendix 1 listing the ALJ considered. 381 F.3d at 670.

Here, like in *Barnett*, the ALJ failed to identify any listings corresponding to the severe impairments found in Step Two. However, unlike the ALJ's decision in *Barnett*, here it cannot be inferred from the ALJ's brief analysis which of the listed impairments he considered. *See id.* at 668. It is imperative that enough information be provided in the ALJ's decision to ensure that this Court can determine whether the ALJ properly evaluated whether Ms. Beach's impairments medically meet or equal any listed impairments. *See id.* at 670.

Furthermore, even if the ALJ did not find that any of Ms. Beach's impairments medically meet listed impairments, there is no indication that he engaged in an equivalence analysis. Therefore, the ALJ's two-sentence consideration at Step Three, like the ALJ's two-sentence consideration in *Barnett*, and his lack of an attempt to engage in an equivalence analysis as mandated by § 404.1526 is inadequate and warrants a remand.

B. Mental Illness Evaluation

Second, Ms. Beach argues that the ALJ failed to utilize the special technique required in 20 C.F.R. § 404.1520a to

analyze her mental impairments. Ms. Beach argues, in particular, that her impairments meet listed impairments sections 12.04[4] or 12.08.[5] The Commissioner argues that the record contains no evidence that would indicate Ms. Beach's impairments meet 12.04 or 12.08 of the listed impairments, and thus the ALJ's reliance on the state agency physician's opinions was proper.

When considering mental impairments, an ALJ must refer to Section 12.00 of the listed impairments in Appendix 1, which describes mental disorders. *See* Appendix 1, § 12.00(A). Each disorder contains a set of medical findings in paragraph A; these "A criteria" are used to substantiate the presence of a particular mental disorder. *Id.* Each disorder also contains a set of impairment-related functional limitations in paragraph B; these "B criteria" describe the impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *Id.* Criteria from paragraphs A and B must be met for the claimant's impairment to meet the listed impairment.[6] *Id.*

---

[4] Section 12.04 of the listed impairments refers to "Affective Disorders."

[5] Section 12.08 of the listed impairments refers to "Personality Disorders."

[6] However, if a listed impairment also contains a paragraph C, which describes additional functional criteria, the claimant's impairment can still meet the listed impairment if paragraph C is met in lieu of paragraph B. *Id.*

Here, in Step Two of the sequential process, the ALJ determined that Ms. Beach suffers from severe mental impairments, including ADD and depression. (R. at 12.) Without a more specific description of the ALJ's analysis in Step Three, this Court cannot determine whether the ALJ in fact used the special technique and neglected to document it, or whether he failed to use the technique entirely, neither of which is proper. *See Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) ("[t]he ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision"). This is especially relevant in this case given Ms. Beach has also been diagnosed with schizoid personality disorder; however, there is no mention of this in the ALJ's Step Three determination. (*See* R. at 12.)

Further, the Commissioner's argument that even without a description of the ALJ's analysis, the record contains no evidence to demonstrate that Ms. Beach has a "marked" restriction as to the paragraph B criteria, is without merit. It is true that the state agency psychologist indicated that Ms. Beach had "moderate," not "marked" limitation of daily activities. (R. at 398.) However, evidence of at least four of the "A" criteria and evidence of two of the "B" criteria can be found in the record. The "A" criteria include: Symptom "a"

of 12.04, pervasive loss of interest in almost all activities:
Ms. Beach indicates on the "Activities of Daily Living
Questionnaire" that she rarely, if ever, plays games or
engages in hobbies because she "feel[s] too depressed." (R. at
149.); Symptom "c" of 12.04, sleep disturbance: Ms. Beach
indicates in the "Activities of Daily Living Questionnaire"
that she is not able to sleep well because she worries about
being unable to maintain a job and fears that she will become
homeless. (R. at 148.); Symptom "g" of 12.04, difficulty
concentrating or thinking: Ms. Beach notes in the "Activities
of Daily Living Questionnaire" that she does not read much due
to her "inability to concentrate." (R. at 149.); and Symptom
"i" of 12.04, hallucinations, delusions, or paranoid thinking:
Ms. Beach's sister noted in the "Function Report - Third
Party" form that Ms. Beach "worries excessively about worldly
happenings - bird flu, terrorism." (R. at 160.)

The record also contains evidence in favor of two of the
"B criteria": (i) marked restriction of activities of daily
living is demonstrated throughout the record by evidence that
Ms. Beach cannot pay her bills on her own, (R. at 160), that
her personal hygiene is lacking (R. at 158), and that her
dishes pile up for days or weeks, (R. at 147); and (ii) marked
difficulties in maintaining concentration, persistence, or
pace is evidenced by Dr. Hovsepian's Attention Deficit

Disorder Testing Report, where he notes that "patient is
having severe levels of difficulty with attention,
concentration, focus . . . ."[7] (R. at 216.)

By identifying the evidence above, this Court is not
making a determination – this is why contrary evidence, if
any, is not discussed here.  Rather, the Court is merely
indicating that there is evidence in the record that should be
considered by the ALJ and discussed in his decision.
Therefore, this issue is remanded for elaboration on his
analysis and reconsideration of his determination.

## III. The ALJ's Step Four Determination

In Step Four of the sequential process, the ALJ
determined that Ms. Beach "has the residual functional
capacity to perform light work[8] . . . ." (R. at 13.) At this

---

[7] It is important to note that a "marked" restriction of
activities of daily living is not defined by a specific
number of activities, but rather by the "nature and overall
degree of interference with function." Listing 12.00(C)(1).

[8]

Light work involves lifting no more than 20 pounds
at a time with frequent lifting or carrying of
objects weighing up to 10 pounds. Even though the
weight lifted may be very little, a job is in this
category when it requires a good deal of walking or
standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg
controls. To be considered capable of performing a
full or wide range of light work, you must have the
ability to do substantially all of these activities.
If someone can do light work, we determine that he
or she can also do sedentary work, unless there are
additional limiting factors such as loss of fine

26

step, an ALJ determines a plaintiff's RFC, or the maximum work that a claimant can still do despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Craft*, 539 F.3d at 675-76. In determining RFC, an ALJ must base his decision on the medical evidence in the record and other evidence, including testimony by the claimant or her friends and family. *Craft*, 539 F.3d at 676. Furthermore, mental limitations must be a part of the determination because a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." 20 C.F.R. § 404.1545(c); *Craft*, 539 F.3d at 676.

Ms. Beach argues that the ALJ's Step Four determination was erroneous. She makes four arguments in support of her conclusion: (i) the ALJ "merely adopted the state agency determination," and ignored evidence in her favor found in the record subsequent to the state agency determination; (ii) the ALJ did not complete a function-by-function analysis of her impairments as required by SSR 96-8p; (iii) the ALJ "failed to

---

dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

consider a whole line of evidence favorable to [her]" and more specifically failed to consider "the effects of a schizoid personality disorder . . . ."; and (iv) the ALJ misinterpreted the consultative examination conducted on February 15, 2007.

First, Ms. Beach asserts correctly that the ALJ merely adopted the state agency determination. There is evidence in the record favorable to Ms. Beach that the ALJ failed to refer to in his analysis. For example, there are medical records subsequent to the state agency evaluation that describe Ms. Beach's depression, (R. at 434.), lack of motivation to take insulin, (*Id.*), failure to follow a diet, (*Id.*), and difficulty processing and retaining information (R. at 451.). The ALJ must provide a "logical bridge" between the evidence and his final determination. *See* Craft, 539 F.3d at 677-78. By neglecting to mention the evidence favorable to Ms. Beach, the ALJ did not construct the logical bridge needed to properly assess his determination. The analysis must be clear as to what evidence was considered and why the conclusion was made in this way. This error is cause for remand.

Second, Ms. Beach is correct in asserting that a function-by-function analysis is required at Step Four. SSR 96-8p states "the RFC assessment *must* first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a *function-by-function*

*basis*. . . ." SSR 96-8p, 1996 SSR LEXIS 5 at *1 (emphasis added); *See Gotz v. Barnhart*, 207 F.Supp.2d 886, 897 (E.D. Wis. 2002). Here, the ALJ merely described the process that is to be followed at Step Four, but did not discuss each function and its effect on Ms. Beach's work-related abilities, as required by SSR 96-8p. SSR 96-8p, 1996 SSR LEXIS 5 at *1. This discussion is essential to an appellate review as the Court must be certain that both Ms. Beach's physical abilities and mental abilities were considered. *See* 20 C.F.R. § 404.1545(b)-(c). This error is cause for remand because the ALJ did not comply with SSR 96-8p.

Ms. Beach is also correct in arguing that this analysis must be completed while evaluating her ability to work on a regular and continuing basis.[9] *See Gotz*, 207 F.Supp.2d at 897. The ALJ made no mention of Ms. Beach's abilities to work on a regular and continuing basis in his discussion at Step Four, or anywhere else in the decision. (*See* R. at 13-14.) Therefore, upon remand, the ALJ must consider Ms. Beach's ability to work on a regular and continuing basis.

Third, the ALJ generally considered Ms. Beach's physical and mental impairments, but did not discuss his analysis in detail. (R. at 13.) He did not need to cite every piece of

---

[9] A regular and continuing basis equates to a forty-hour work week; essentially eight hours a day for five days a week. *Gotz*, 207 F.Supp.2d at 897.

evidence contained in the record in his decision, rather he must "articulate at some minimal level his analysis of the evidence." *See Herron*, 19 F.3d at 333. His discussion of Ms. Beach's mental impairments, however, was abrupt and provides less than minimal analysis of the evidence. The ALJ merely stated, "At the consultative psychological examination on February 15, 2007, the claimant obtained a full-scale IQ score of '90' . . . was found with some signs of dysthymia and a schizoid personality disorder, and rated with a GAF above '50'." (R. at 13.) As Ms. Beach asserts, there is certainly ample evidence of mental impairment throughout the record. (*See* Brief for Plaintiff at 10.) Whether the ALJ's determination is correct is not for the Court to decide; the problem is, again, that not enough information was provided to build the logical bridge necessary from the evidence to the ultimate conclusion made. Upon remand, the ALJ must provide in his analysis more information pertaining to what evidence he considered and how he reached his conclusion.

Furthermore, as in previous steps, the ALJ failed to conduct the special procedure for mental impairments, *supra*, mandated by 20 C.F.R. § 404.1520a. There is ample evidence in the record noting Ms. Beach's mental impairments, including an

Axis I[10] diagnosis of dysthymic disorder,[11] an Axis II diagnosis

of schizoid personality disorder, and Axis III diagnosis of

diabetes mellitus, an Axis IV diagnosis of problems related to

the social environment, and an Axis V GAF rating of 53.[12] There

is also evidence in the record stating that Ms. Beach suffers

from ADD.[13] (*See* R. at 214-17.) These are all serious disorders

that could affect Ms. Beach's performance during future

employment; thus, her mental impairments must be properly

considered in the ALJ's analysis.

Fourth, Ms. Beach also correctly asserts that the ALJ's

statement that "her vision tested within a normal range, her

---

[10]The American Psychiatric Association has developed a "multiaxial
assessment" system that includes five axes: Axis I pertains to
clinical disorders; Axis II pertains to personality disorders and
mental retardation; Axis III pertains to general medical
conditions; Axis IV pertains to psychosocial and environmental
problems; and Axis V is the Global Assessment of Functioning.
*Diagnostic and Statistical Manual of Mental Disorders*, p. 25.
[11] Dysthymic disorder is found in a person who has a "chronically
depressed mood that occurs for most of the day more days than not
for at least 2 years." *Diagnostic and Statistical Manual of
Mental Disorders*, p. 345.
[12] The Global Assessment of Functioning ("GAF") indicates the
"clinician's judgment of the individual's overall level of
functioning." *Diagnostic and Statistical Manual of Mental
Disorders*, p. 30. A GAF score of 53 indicates "moderate symptoms
(e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
co-workers)." *Diagnostic and Statistical Manual of Mental
Disorders*, p. 32.
[13] Attention Deficit/Hyperactivity Disorder is found in a person
with "a persistent pattern of inattention and/or hyperactivity-
impulsivity that is more frequently displayed and more severe
than is typically observed in individuals at a comparable level
of development."

lungs were clear, and there was no indication of end organ damage due to diabetes mellitus" is a medical interpretation, not merely an observation. The ALJ cannot "play[] doctor" and make medical determinations based on facts provided in medical reports. *Myles v. Astrue*, 582 F.3d 672, 677, (7th Cir. 2009). Here, the ALJ made medical determinations despite evidence from the same report that concludes the contrary. For example, the ALJ concluded that Ms. Beach's vision tested within normal range based on the consultative examination report, but the doctor stated in the same report that "still her vision is poor." (R. at 385.) The ALJ should use the medical information and conclusions in making a determination based on the law, but should not make his own medical conclusions to apply to the law.

Ms. Beach also makes additional minor arguments pertaining to the ALJ's Step Four determination[14] that need not be addressed at this point because, for the reasons stated above, the ALJ erred in the process of making his Step Four determination and these errors warrant a remand.

---

[14] Ms. Beach also makes two other arguments presented for review that were not discussed in her brief and, therefore, are not addressed in this opinion.

## CONCLUSION

It is THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment to Remand the Case be, and the same hereby is, GRANTED. IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, DENIED.


Date: August 4, 2010          E N T E R E D:


MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT